UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| NICKOLAS SEEKINS, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) No. 1:19-cv-02224-JMS-TAB ) |
| CHEP USA AND CHEP RECYCLED PALLET SOLUTIONS, LLC, | ) ) ) ) |
| Defendants. | ) |

**ORDER**

In this diversity action, Plaintiff Nickolas Seekins has sued Defendants CHEP USA and CHEP Recycled Pallet Solutions, LLC (collectively, "CHEP"), alleging that CHEP's negligence caused personal injuries that he suffered while working at a distribution center. CHEP has filed a Motion for Summary Judgment. [Filing No. 69.] In responding to CHEP's Motion for Summary Judgment, Mr. Seekins has filed a Cross-Motion for Partial Summary Judgment on the issue of whether CHEP owed Mr. Seekins a duty of care. [Filing No. 96.] CHEP has filed a Motion to Strike Mr. Seekins' Response and Cross-Motion for Summary Judgment. [Filing No. 98.] These matters are now ripe for the Court's decision.

**I.
STANDARD OF REVIEW FOR SUMMARY JUDGMENT**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed.

R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the granting of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to

the summary judgment motion before them." *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the summary judgment standard detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

**A. The Parties and the Distribution Center**

The company doing business as Dollar General owns and operates a distribution center in Marion, Indiana. [*See* Filing No. 1-3 at 2; Filing No. 69-1 at 1.] Dollar General has hired third parties to perform certain tasks within the distribution center. Dollar General contracted with LMS Intellibound, LLC, *dba* Capstone Logistics ("Capstone") to provide certain labor at the distribution center, including labor for the unloading of trucks arriving at the distribution center. [Filing No. 69-1 at 13 (contract between Capstone and Dollar General); Filing No. 69-6 at 3.] In May 2017, Mr. Seekins was working for Capstone at the Dollar General distribution center unloading trucks. [*See* Filing No. 1-3 at 2.]

Separately, Dollar General also contracted with CHEP to perform certain services at the Marion distribution center. [Filing No. 69-2 (contract between CHEP and Dollar General).] Specifically, CHEP was responsible for managing and coordinating the processing and flow of pallets used at the distribution center. [Filing No. 69-2 at 12-13.] To accomplish these tasks,

3

CHEP had its own employees at the distribution center to handle the pallets. [Filing No. 69-2 at 13.]

While Capstone and CHEP each had a contractual relationship with Dollar General, Capstone and CHEP did not have a direct relationship with one another. [*See* Filing No. 69-3 at 5.] CHEP's contract with Dollar General did not reference Capstone. [*See* Filing No. 69-2.]

### B.  Stow Jacks at the Distribution Center

Dollar General owned certain powered equipment at the distribution center, including all the stow jacks, which are machines generally used to lift and transport pallets. [Filing No. 69-6 at 2.] Both Capstone and CHEP were permitted to use the stow jacks to perform their work at the distribution center. [Filing No. 69-1 at 5; Filing No. 69-6 at 3.] The stow jacks were available to Capstone and CHEP workers at the distribution center on a "first come, first serve" basis. [Filing No. 69-9 at 13.] Workers for Capstone and CHEP would claim a stow jack simply by finding an unoccupied stow jack within the distribution center and taking it for their use. [Filing No. 69-6 at 7; Filing No. 69-6 at 9.]

Dollar General personnel were responsible for maintaining the stow jacks. [Filing No. 69-6 at 15 (Q. "So Dollar General's maintenance department was solely responsible for performing the maintenance on the Dollar General stow jacks that were used at the Dollar General Distribution Center in Marion, Indiana, in May of 2017?  A. Yes.").] This included regular preventative maintenance and as-needed maintenance. [Filing No. 69-6 at 3; Filing No. 69-6 at 6.] CHEP employees were not permitted to perform maintenance on Dollar General's stow jacks. [Filing No. 69-6 at 15.]

When an employee of Capstone or CHEP had an issue with a stow jack, that employee was to bring the stow jack to the Dollar General maintenance shop within the distribution center and

4

fill out a "red tag" that identified the problem with the equipment. [Filing No. 69-6 at 6; Filing No. 97-3 at 4.] If the stow jack was inoperable or not safe to operate, the user would contact Dollar General maintenance personnel, who would then tow the equipment to the maintenance shop. [Filing No. 69-6 at 6.] Once in the maintenance shop, a Dollar General maintenance employee would look at the stow jack and attempt to identify the problem and fix the issue. [Filing No. 69-6 at 6.] Once a piece of equipment was red tagged for maintenance, only Dollar General mechanics or supervisors could remove the tags. [Filing No. 69-6 at 8.] Sometimes, however, workers, including CHEP workers, would simply leave stow jacks in the maintenance shop without completing a red tag. [Filing No. 69-7 at 1; Filing No. 97-2 at 20-21; Filing No. 97-8 at 2-3.] When this occurred, Dollar General maintenance personnel would "[t]ry to find out who had driven it," to determine what the issue was, but if that failed, the maintenance personnel would "[t]ake [the equipment] for a test spin, see if [they] could get something to act wrong or for the piece of equipment to actually throw a code" to identify the problem to fix before placing the equipment back out on the distribution center's floor for use. [Filing No. 69-7 at 2.] If a Dollar General mechanic could not identify any issues with the equipment during the test drive, the equipment was placed back out on the floor and a red tag may or may not be generated by maintenance personnel. [Filing No. 69-6 at 10; Filing No. 97-3 at 8-9.]

### C. Mr. Seekins' Accident on May 16, 2017

On the morning of May 16, 2017, Mr. Seekins began his shift at the distribution center around 4:30 or 5:00 a.m. [Filing No. 69-9 at 6.] Dollar General labeled its equipment with numbers to differentiate the machines. [Filing No. 69-6 at 2.] That morning, Mr. Seekins had claimed stow jack 4 ("SJ4") for his use. [Filing No. 69-9 at 8.] Capstone had trained Mr. Seekins on the safe operation of Dollar General's stow jacks and required him to perform a 12-point

5

inspection prior to using the machines. [Filing No. 69-9 at 2; Filing No. 69-10.] Mr. Seekins performed the 12-point inspection prior to his use of the SJ4 on May 16, 2017. [Filing No. 69-9 at 11; Filing No. 69-10 at 24.] He did not document any issues with the SJ4 at that time. [Filing No. 69-10 at 24.]

Mr. Seekins drove the SJ4 to bay 4, where he was assigned to unload a truck. [Filing No. 69-9 at 14.] As he operated the SJ4 in that bay, the SJ4 "jumped," but he did not report this issue to Dollar General maintenance. [Filing No. 69-9 at 8; Filing No. 69-9 at 21.] After Mr. Seekins completed unloading his assigned truck, he began driving the SJ4 down a long corridor, stopping at each bay door without any braking issues. [Filing No. 69-9 at 16.] Eventually Mr. Seekins arrived at bay 2, where he made a left turn. [Filing No. 69-9 at 15.] A forklift was parked at the end of the aisle for bay 2, which was 45 feet away from Mr. Seekins after he made the turn. [Filing No. 69-9 at 15.] As Mr. Seekins approached the forklift, he attempted to reverse throttle, or "plug," the SJ4 to slow it down. [Filing No. 69-9 at 18.] When the SJ4 failed to slow down in response, Mr. Seekins engaged the emergency brake in an effort to stop the SJ4 and avoid hitting the parked forklift. [Filing No. 69-9 at 18-19.] Mr. Seekins then jumped off the SJ4, and his foot was crushed between the SJ4 and the parked forklift. [Filing No. 69-9 at 19-20.] The injury ultimately resulted in the amputation of Mr. Seekins' foot. [*See* Filing No. 1-3 at 1.]

### D. Issue with a Stow Jack on May 15, 2017

CHEP's on-site manager, Michael Rueber, recalled that on the day prior to Mr. Seekins' accident—on May 15, 2017—a CHEP employee at the distribution center had braking and steering issues with a stow jack, but Mr. Rueber could not recall the identity of the employee that reported the problem. [Filing No. 97-1 at 17.] Mr. Rueber recalled telling the employee to take the stow jack to Dollar General's maintenance shop. [Filing No. 97-1 at 17.] In response, Mr. Rueber said

6

that the "person in question took it [the stow jack] down to maintenance" and "walked back because there was no other equipment available." [Filing No. 97-1 at 18.] "Lock-out, tag-out" generally refers to a procedure for disabling powered equipment by removing the starter or otherwise deactivating power to the equipment, placing a locking enclosure on the device, and placing a sign on it indicating that the equipment is disabled. [*See* Filing No. 69-3 at 5; Filing No. 69-4 at 10-11.] While CHEP had the ability to lock-out its own equipment, it did not have the devices necessary to lock-out Dollar General's stow jacks. [Filing No. 69-4 at 15.]

Following Mr. Seekins' accident, Mr. Rueber testified that there was "some speculation" among CHEP employees that "it may have been the same piece of equipment," but no one knew if it was the SJ4 that the CHEP employee had turned into Dollar General maintenance the day prior. [Filing No. 97-1 at 25-26.] Dollar General's records do not contain a red tag for the SJ4 on May 15, 2017 or May 16, 2017 immediately prior to the accident. [Filing No. 69-6 at 17.] CHEP employee Darin Fridley testified that he thought fellow CHEP employee Jason Brown was the individual who reported a stow-jack problem on May 15, 2017. [Filing No. 97-2 at 5-6.] Mr. Fridley testified that following Mr. Seekins' accident, Mr. Brown told him that the stow jack he was using on May 15, 2017 was not stopping properly and that he informed Dollar General's maintenance department of the problem. [Filing No. 97-2 at 6-7.] Mr. Fridley further testified that Mr. Brown told him that he thought the stow jack that he had an issue with on May 15, 2017 was the same stow jack involved in Mr. Seekins' accident (*i.e.*, the SJ4). [Filing No. 97-2 at 13-14.] Mr. Brown is now deceased. [Filing No. 69-11 at 5.]

### E. Post-Accident Inspections of the SJ4

Dollar General's maintenance department tested the SJ4 on May 16, 2017, immediately following Mr. Seekins' accident. [Filing No. 69-7 at 5; Filing No. 69-8.] The test did not reveal

7

any issues with the SJ4's brakes but did find that the plugging function—which slows down the SJ4—failed to properly operate on one out of 20 attempts. [Filing No. 69-7 at 5-6.] Dollar General also had a manufacturer technician test the SJ4 a few days following the accident. [Filing No. 69-16 at 2.] The technician found no issues with the SJ4. [Filing No. 69-16 at 4.]

## III.
### DISCUSSION

Mr. Seekins asserts a negligence claim against CHEP related to the purported malfunction of the SJ4 while being used by a CHEP employee the day prior to his accident. When the Court sits in diversity, as it does in this case, its duty "is to decide issues of Indiana state law as [the Court] predict[s] the Indiana Supreme Court would decide them today." *Doermer v. Callen*, 847 F.3d 522, 527 (7th Cir. 2017). Under Indiana law, "to recover on a negligence theory, a plaintiff must establish: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff resulting from the defendant's breach." *Miller v. Rosehill Hotels, LLC*, 45 N.E.3d 15, 19 (Ind. Ct. App. 2015).

At the outset, the Court addresses CHEP's Motion to Strike Plaintiff's Response and Cross-Motion for Summary Judgment. [Filing No. 98]. That Motion is **DENIED**. The Court has considered Mr. Seekins' Response and Cross-Motion, [Filing No. 96; Filing No. 97], in full. However, the Court advises and cautions Plaintiff's counsel to review and adhere to the Local Rules of the Court on all future filings, in particular S.D. Ind. Local Rule 56-1 concerning summary judgment filings. Mr. Seekins' Response and Cross-Motion, did not meet the standards of Local Rule 56-1 inasmuch as disputed and undisputed material facts are not clearly identified.

CHEP argues that it is entitled to summary judgment because it did not owe Mr. Seekins a duty of care with respect to the SJ4 because CHEP did not own, maintain, or supply the SJ4, nor did it employ Mr. Seekins. [Filing No. 70 at 13.] CHEP argues that even if the Court finds it had

8

a duty of care, it is still entitled to summary judgment because Mr. Seekins has not produced any evidence showing breach, contending that Mr. Seekins "can offer no admissible evidence that CHEP possessed either the SJ4 or knowledge of its alleged braking issue before the accident." [Filing No. 70 at 18.] Finally, CHEP argues that Mr. Seekins has not produced evidence to establish proximate cause between any failure by CHEP to satisfactorily report a braking issue and Mr. Seekins' accident. [Filing No. 70 at 23.]

Mr. Seekins responds that CHEP owed a duty of care to all foreseeable users of the SJ4 pursuant to the Indiana Supreme Court's decision in *Dutchmen Mfg., Inc. v. Reynolds*, 849 N.E.2d 516 (Ind. 2006). [Filing No. 96 at 7.] Mr. Seekins seeks partial summary judgment on this issue, asking the Court to find that CHEP owed Mr. Seekins a duty of care as it relates to the SJ4. [Filing No. 96 at 7.] Mr. Seekins further responds that there is sufficient evidence to enable a jury to find that CHEP breached the duty it owed to Mr. Seekins because CHEP did not institute OSHA-standard lock-out, tag-out protocol after a CHEP employee experienced a braking issue while operating the SJ4. [Filing No. 96 at 12-13.] Finally, Mr. Seekins argues that questions regarding proximate cause are issues for the factfinder. [Filing No. 96 at 17.]

In reply, CHEP contends that *Dutchmen* is inapplicable to Mr. Seekins' claim because CHEP did not "supply" the SJ4 to Mr. Seekins; Dollar General did. [Filing No. 110 at 3-6.] CHEP also responds that the only evidence of breach identified by Mr. Seekins consists of inapplicable OSHA standards and inadmissible hearsay about a purported braking issue experienced by a now deceased CHEP employee. [Filing No. 110 at 6-16.] Finally, CHEP contends that questions of causation are not *de facto* jury issues where a plaintiff has not brought forth evidence that the purported breach caused the injury. [Filing No. 110 at 16.]

9

Both parties seek summary judgment on the issue of whether CHEP owed Mr. Seekins a duty of care under Indiana negligence law. [Filing No. 70 at 13; Filing No. 96 at 12.] "Absent a duty, there can be no breach, and therefore no recovery for the plaintiff in negligence." *Pfenning v. Lineman*, 947 N.E.2d 392, 398 (Ind. 2011) (quoting *Vaughn v. Daniels Co. (West Virginia), Inc.*, 841 N.E.2d 1133, 1143 (Ind. 2006)). Whether a duty exists is generally a question of law for the court. *Id.* "A duty of reasonable care is not, of course, owed to the world at large, but arises out [of the] relationship between the parties." *Clary v. Dibble*, 903 N.E.2d 1032, 1038 (Ind. Ct. App. 2009).

Mr. Seekins and CHEP had no direct relationship. Mr. Seekins' employer, Capstone, had no direct relationship with CHEP either; instead, each company had separate contractual relationships with Dollar General at the distribution center. Mr. Seekins relies on *Dutchmen Mfg., Inc. v. Reynolds*, 849 N.E.2d 516 (Ind. 2006), a failure-to-warn negligence case, to establish a relationship between Mr. Seekins and CHEP.

*Dutchmen* concerned Indiana's application of Section 388 of the Restatement (Second) of Torts. Section 388 addresses liability for injuries caused by dangerous chattels and provides that:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>     (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>     (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>     (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

RESTATEMENT (SECOND) TORTS § 388 (1965). In *Dutchmen*, an employee of Keystone RV was injured when scaffolding broke loose and struck him while working at the facility leased by

Keystone RV. 849 N.E.2d at 518. The scaffolding had been constructed and installed by Dutchmen, the prior lessee of the facility. *Id.* The injured worker sued Dutchmen for negligence. *Id.* The court found that Section 388 imposed a duty of care on Dutchmen as the "supplier of a chattel" that could be liable for a "failure to exercise reasonable care to provide any expected user of the chattel any information as to the 'character and condition of the chattel . . . which [the supplier] should recognize as necessary to enable [the user] to realize the danger of using it.'" *Id.* at 522 (quoting RESTATEMENT (SECOND) TORTS § 388 cmt. b) (alterations in original). Mr. Seekins appears to argue that CHEP, as a recent user of the SJ4, supplied Mr. Seekins with the SJ4, and therefore under *Dutchmen*, it had a duty to warn Mr. Seekins about the defective braking experienced by a CHEP employee on May 15, 2017 or ensure that the SJ4 was taken out of circulation at the distribution center. [*See* Filing No. 96 at 12 ("Under Dutchman (sic) and the Restatement, CHEP owed a duty to provide to any expected user of the chattel any information as to the 'character and condition of the chattel … which [the supplier] should recognize as necessary to enable [the user] to realize the danger of using it."' (quoting RESTATEMENT (SECOND) TORTS § 388 cmt. b) (alterations in original)).]

However, the *Dutchmen* decision has limited utility here. The decision focused less on whether Dutchmen—who was effectively the manufacturer, installer, and seller of the defective scaffolding—was a supplier, but rather: (a) whether the scaffolding was a chattel (the court answered in the affirmative); and (b) whether the scaffolding was so obviously dangerous that Dutchmen had no additional duty to warn (the court answered in the negative). *Dutchmen Mfg.*, 849 N.E.2 at 522-23. Indeed, the court noted that for purposes of Section 388, "Dutchmen was a 'supplier'" and that "Dutchmen does not contend otherwise." *Id.* at 521. In concluding that Dutchmen was a supplier, the court noted that "Dutchmen was not only the manufacturer of the

11

scaffolding, it also turned the scaffolding over for Keystone's 'use' in return for consideration" such that the scaffolding "was not simply abandoned property . . . which we assume, without deciding, would not ordinarily render an existing tenant a 'supplier'" under Section 388. *Id.*

The comments to Section 388 define "supplier" as "any person who . . . gives possession of a chattel for another's use or who permits another to use or occupy it while it is in his own possession or control" and specify that "sellers, lessors, donors, or lenders" and "all kinds of bailors" are included within the definition. RESTATEMENT (SECOND) TORTS § 388, cmt. c. There is no evidence that CHEP sold, leased, donated, or lent the SJ4 to Mr. Seekins or his employer. There is no evidence that a bailment[1] relationship existed between CHEP and Mr. Seekins or that a CHEP employee directly gave the SJ4 to Mr. Seekins. Instead, Dollar General owned, controlled, and maintained the SJ4 for use by Mr. Seekins and other Capstone employees at the distribution center. Indeed, in a related case concerning this accident, the Court noted that it was "undisputed that Dollar General supplied Mr. Seekins with the SJ4" and therefore it was "clear that Dollar General was a supplier of chattel for the purpose of Section[] 388." *Seekins v. Dolgencorp, LLC*, No. 1:17-cv-4415-JMS-TAB, 2019 WL 1472379, at *9 (S.D. Ind. Apr. 3, 2019).

The most accurate description of the relationship between Mr. Seekins and CHEP with respect to the SJ4 was that of occasional co-borrowers. Mr. Seekins has not cited any cases that stand for the proposition that co-borrowers of a piece of equipment owe a duty to one another when another party owns, lends, and maintains the equipment at issue. In addition, Mr. Seekins has not identified, and the Court has not located, any support for interpreting "provider" to mean

---

[1] A bailment is "an express or implied agreement between a bailor and a bailee in which a bailee is entrusted to accomplish a specific purpose with the bailor's personal property; when the purpose is accomplished, the property is returned to the bailor." *Kottolowski v. Bridgestone/Firestone, Inc.*, 670 N.E.2d 78, 82 (Ind. Ct. App. 1996).

12

"any prior user" of the chattel for purposes of Section 388. Because CHEP did not owe Mr. Seekins a duty under Indiana negligence law, CHEP's Motion for Summary Judgment, [Filing No. 69], is **GRANTED**, and Mr. Seekins' Cross-Motion for Partial Summary Judgment, [Filing No. 96], on the issue of duty of care is **DENIED**.

The Court need not address the remaining arguments in CHEP's Motion for Summary Judgment concerning breach and causation because the Court's finding that CHEP did not owe Mr. Seekins a duty as a matter of law under the facts here is fatal to Mr. Seekins' claim. *See Pfenning, 947 N.E.2d at 398* ("Absent a duty, there can be no breach, and therefore no recovery for the plaintiff in negligence.").

## IV.
### CONCLUSION

For the reasons explained above, Defendants CHEP USA and CHEP Recycled Pallet Solutions, LLC's Motion for Summary Judgment, [69], is **GRANTED**, and Plaintiff Nickolas Seekins' Cross-Motion for Partial Summary Judgment, [96], is **DENIED**. Defendants' Motion to Strike Plaintiff's Response and Cross-Motion for Summary Judgment, [98], is **DENIED**. As a result of the summary-judgment ruling, Defendants' Motion to Bar or Limit Plaintiff's Expert Sara Ford, [87], Defendants' Motion to Bar Plaintiff's Expert Frank Burg, [88], and Defendants' Motion to Bar or Limit Plaintiff's Expert Abigail Stanley, [89], are **DENIED AS MOOT**. Final judgment shall issue accordingly.

Date: 10/29/2020

*[signature: Jane Magnus-Stinson]*

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**